IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. NO. 08-00739 (02) SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER DENYING PETITION UNDER |
| | ) | 28 U.S.C. § 2255; ORDER |
| JOHN GOUVEIA, JR. (02), | ) | DENYING REQUEST FOR DNA |
| | ) | TESTING OF EVIDENCE |
| Defendant. | ) | |
| _____ | ) | |

**ORDER DENYING PETITION UNDER 28 U.S.C. § 2255;**
**ORDER DENYING REQUEST FOR DNA TESTING OF EVIDENCE**

I.      **INTRODUCTION.**

On August 18, 2010, a jury convicted Defendant John
Gouveia, Jr., of three drug crimes. See Verdict Form, Aug. 18,
2010, ECF No. 174. Gouveia's crimes included: 1) conspiring to
distribute and possess with intent to distribute more than 500
grams of a mixture or substance containing a detectable amount of
methamphetamine, its salts, isomers, and salts of its isomers;
and 2) two counts of possession with intent to distribute the
same. Id.

On February 4, 2011, the court sentenced Gouveia to 292
months of imprisonment as to each count, with all terms to run
concurrently. See Judgment, ECF No. 231. The court also
sentenced him to 10 years of supervised release for each of the
counts, with all terms to run concurrently, as well as a $300
special assessment. Id.

On February 9, 2011, Gouveia appealed.  See ECF No. 232.  The Ninth Circuit affirmed the judgment in a Memorandum Decision filed on February 23, 2012.  See ECF No. 484-1.  The Mandate issued on March 16, 2012.  See ECF No. 415.  Gouveia petitioned for certiorari, but that was denied by the Supreme Court on October 1, 2012.  See 133 S. Ct. 188 (Oct. 1, 2012).

Before the court is Gouveia's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, timely filed on September 23, 2013.  See ECF No. 471.  The court denies this motion and declines to issue a certificate of appealability.

The court also denies Gouveia's request for DNA testing of evidence.

II.      **BACKGROUND FACTS.**

A.      **Evidence at Trial.**

In July 2006, DEA Special Agent Richard Jones received a phone call from the Riverside County Sheriffs Department in California, informing Jones that there were drugs in a car being shipped to Hawaii from California.  See Testimony of Richard Jones at 2-33, Aug. 4, 2010, ECF No. 504-2, PageID # 6808.  Jones says he went to Matson to see whether a car matching the description he got was indeed being shipped.  Id.

Vernon Ramie, a Matson employee, testified that, based on Exhibit 107, which was received in evidence, a 1992 Mercury

Grand Marquis was shipped by Howard Peterson.  This car was gold
and had license plate 3VGA124.  <u>See</u> Testimony of Vernon Ramie at
2-172 to 2-173, Aug. 4, 2010, ECF No. 504-2, PageID #s 6947-48.
Special Agent Jones testified that this matched the description
of the car given to him by the Riverside County Sheriffs
Department.  <u>See</u> Jones Test. at 2-33 to 2-34, PageID #s 6908-09.
Based on Exhibit 108, which was received in evidence, Ramie
testified that Matthew Hernandez was authorized to pick up the
car when it reached Hawaii.  <u>See</u> Ramie Test. at 2-174, PageID
# 6949.

A search warrant was obtained for the vehicle.  <u>See</u>
Jones Test. at 2-36, PageID # 6811; <u>see</u> <u>also</u> ECF No. 484-3 (copy
of Search Warrant for 1992 Mercury Grant Marquis with license
plate number 3VGA124).  Pursuant to the search warrant, Jones and
other agents searched the car.  They found drugs in its
driveshaft.  <u>See</u> Jones Test. at 2-36 to 2-41, PageID #s 6811 to
6816.  The drugs were sent to the DEA Southwest Laboratory in
Vista, California, which identified the drugs as methamphetamine
hydrochloride with a purity of 50% and a net weight of 6,210
grams.  <u>Id.</u> at 2-42, PageID # 6817.

Agents replaced the driveshaft and dusted it with
Sirchie Powder in preparation for a controlled delivery of the
car.  <u>Id.</u> at 2-48, PageID # 6823.  DEA Special Agent Clement Sze
testified that the Sirchie Powder did not adhere to the

driveshaft. Testimony of Clement Sze at 4-84, Aug. 6, 2010, ECF No. 505-1, PageID # 7229. Agents ultimately took the car back to Matson. Jones Test. at 2-51, PageID # 6826.

Agents then went to the Honolulu International Airport to check on whether there was a Matthew Hernandez arriving on an incoming flight. They determined that he and Jose Perez were on a United Airlines flight arriving on the evening of July 26, 2006. The agents located Matthew Hernandez and Jose Perez at the airport, then followed them to the Ohana West Hotel. Jones Test. at 2-52 to 2-53, PageID #s 6827-28.

Around 10:00 the next morning, someone picked up the Mercury Grand Marquis from Matson and drove it to the Ohana West Hotel. See id. at 2-54 to 2-55, PageID #s 6829-30. It was later driven to Sand Island Access Road and parked in a parking lot. Agents did not see the car driven there, but they located it using a GPS device that had been placed in it. Agents did see a white Dodge Durango driven by Gouveia pull up to the Mercury Grand Marquis; agents also saw Jose Perez get out of the Durango and get into the Mercury Grand Marquis. The two cars were then driven away, with the Mercury Grand Marquis following the Durango. Agents followed the cars until they were parked on the top level of the Pearlridge Shopping Center. Id. at 2-56 to 2-57, PageID #s 6831-32. Sergeant Akana testified that the Durango was parked normally, but that the Mercury Grand Marquis was in a

4

raised position, with its back tires on the cement block designed as a backstop for parked cars. See Testimony of Burt Akana at 1-10, Aug. 3, 2010, ECF No. 504-1, PageID # 1-10; Cross-Examination of Burt Akana at 2-15, Aug. 4, 2010, ECF No. 504-2, PageID # 6790.

After seeing both Perez and Gouveia under the Mercury Grand Marquis, the agents closed in and arrested them. At the time of the arrest, Perez was standing or kneeling next to the car, and Gouveia was underneath it. Jones told Gouveia, "Come out from underneath the vehicle." Jones Test. at 2-62, PageID # 6837. Gouveia emerged from underneath the car holding a Craftsman socket wrench. Jones says that, when he looked under the car, he could see three bolts from the rear differential that had been removed and placed on the ground. Id. at 2-63 to 2-64, PageIDs # 6838-39.

Agents searched both vehicles and found a Craftsman tool set in the Durango. Id. at 2-65, PageID # 6840. The tool set was missing a socket like the one Gouveia had been holding. Id. at 2-67, PageID # 6842.

Sergeant Burt Akana of the State of Hawaii Sheriff's Department testified that he assisted in the search of the Durango. He testified that he found in the car a pipe cutter and a receipt for the pipe cutter, which were received in evidence as Exhibits 104 (pipe cutter) and 105 (receipt for pipe cutter).

See Testimony of Burt Akana at 1-12 to 1-13, Aug. 3, 2010, ECF
No. 504-1, PageID #s 6763-64; Government's Exhibit List, ECF No.
177, PageID # 925.

Advised of their Miranda rights, Perez and Gouveia
waived those rights and made statements to the agents.  See Jones
Test. at 2-71 to 2-72, PageID #s 6846-47.  Gouveia told Jones
that Gouveia was helping a friend, "Jose," fix his car.  Id. at
2-73, PageID # 6848.  He said he knew "Jose" through his brother,
Franky.  Gouveia told Jones that he met with Perez that day at
the Pearlridge Shopping Center.  Id.  Jones then told Gouveia
that Jones had seen him at the parking lot on Sand Island Access
Road and asked why they had not tried to fix the car there.  Id.
at 2-74, PageID # 6849.  Jones testified that Gouveia looked as
if he did not understand what was going on.  Id.  Jones then
confronted Gouveia about purchasing the pipe cutter to remove the
drugs in the driveshaft.  Id.  Gouveia questioned why, if he knew
there were drugs in the driveshaft, he would have removed the
driveshaft in such a public place.  Id.

Later on July 27, 2006, Jones had Perez call Perez's
half-brother, Ramiro Hernandez.  The calls were recorded.  At
trial, Jones identified Perez's voice in the recording, which
Jones said he recognized from having been in the room at the time
of the conversations.  See Jones Test. at 2-75 to 2-80, PageId #s
6850-55.  Jones testified that he instructed Perez to call Ramiro

6

Hernandez and "advise him that he had given the drugs to Gouveia." Id. at 2-78, PageID # 6853. Jones told Perez to leave it at that and to let the conversation proceed so that Perez could receive further instructions. Id. Perez was to call the methamphetamine "stuff" and the driveshaft "pipes." Id. Recordings of these conversations were played to the jury during Special Agent Sze's testimony over Gouveia's objection that they violated his right to confront witnesses against him. See Sze Test. at 4-107, ECF No. 505-1, PageID # 7252.

The jury reviewed transcripts of these calls, which Gouveia submits as part of his motion. See ECF No. 472-6. As noted in the transcripts, which were not received in evidence, in the taped conversations Perez told Ramiro Hernandez that the "pipes" were taken off and given to "him." Perez said he told "him" that Ramiro Hernandez wanted twenty-five, and was told by "him" that "he" wanted to do twenty. Gouveia's name was not specifically mentioned.

There appears to be no dispute that, in a separate case discussed later in this order, Perez pled guilty to related crimes and, pursuant to a plea agreement, agreed to testify against Gouveia and Matthew Hernandez. Perez later refused to testify in that case, causing the Government to dismiss the indictment in that case with respect to Gouveia and Matthew Hernandez.

7

Michael Savaiineea, operations manager for Hawaii Pacific Plumbing, which is located about two blocks from the parking lot on Sand Island Access Road, testified about the sales receipt found in the Durango (Exhibit 105). He testified that it was the customer's copy of a Hawaii Pacific Plumbing invoice dated July 27, 2006. See Testimony of Michael Savaiineea at 3-74 to 3-76, ECF No. 504-3, PageID # 7036-38. Savaiinea said that he himself had prepared that invoice. He further testified that the customer for that transaction had given him the name "John" and the phone number "217-6566." Id. at 3-77, PageID # 7039. The court takes judicial notice that, when calling a number on Oahu from another number on Oahu, one need not dial the 808 area code.

Sergeant Akana found three phones in the Durango that Gouveia had been driving. These phones were received in evidence as Exhibits 300, 301, and 302. See Akana Test. at 1-15, ECF No. 504-1, PageID # 6766. Exhibit 300 was a cellular telephone with number (808) 217-6566. See Testimony of DEA Special Agent Clement Sze at 4-99, Aug. 6, 2010, ECF No. 505-1, PageID #4-99; ECF No. 177, PageID # 926. Exhibit 301 was a cellular telephone with number (808) 699-6917. Exhibit 302 was a cellular telephone with number (808) 936-9363. Id. at 4-100 to 4-101, PageID #s 7245-46.

Joanne Kealiinohomoku, an associate retail manager with AT&T Mobility, testified that AT&T does not require any picture

8

identification for the purchase of a prepaid phone.  Testimony of
Joanne Kealiinohomoku at 4-70, Aug. 6, 2010, ECF No. 505-1,
PageID # 7215.  She testified that, based on AT&T's records,
(808) 217-6566 was a prepaid phone in the name of "John Kay" and
(808) 936-9363 was a prepaid phone in the name of "John
Singleton."  Id. at 4-71 to 4-72, PageID #s 7216-17.

  The invoice found in the Durango that Gouveia was
driving indicated that it was for "a quick-release tubing cutter
that the plumbers use to cut through pipes" and "a tubing cutting
wheel."  Id. at 3-77, PageID # 7039.  Savaiineea testified that
the cutting wheel that comes with the tubing cutter is meant to
only cut PVC pipe, whereas the "tubing cutting wheel" that was
purchased is "mainly used to cut through iron or copper."  Id. at
3-78, PageID # 7040.  Savaiineea examined the pipe cutter,
Exhibit 104, and testified that the "tubing cutting wheel"
attached to it was the separately purchased wheel for cutting
metal, rather than the original wheel for cutting plastic.  Id.
He testified that the pipe cutter was designed to cut pipe from 1
inch to 4 inches in inside diameter.  Id. at 3-79, PageID # 7041.
Special Agent Jones testified that the Mercury Grand Marquis's
driveshaft was "about three-and-a-half inches" in diameter.  See
Jones Test. at 2-40, ECF No. 504-2, PageID # 6815.

  Agents found two cell phones on Perez.  The phones,
received in evidence as Exhibits 201 and 202, had numbers (760)

601-2940 and (808) 345-9261.  <u>See</u> Jones Test. at 2-70, PageID #
6845; Sze Test. at 5-26, PageID # 7293.  Kealiinohoku, of AT&T,
testified that (808) 345-9261 was a prepaid cellular phone in the
name of Jose Perez.  Kealiinohoku Test. at 4-70, ECF No. 505-1,
PageID # 7215.  Jeff Strohm, custodian or records for Sprint
Nextel Telecommunications, testified that (760) 601-2940 was a
prepaid account in the name of "CV Wireless," in Coachella,
California.  Testimony of Jeff Strohm at 5-19 to 5-20, and 5-24,
Aug. 10, 2010, ECF No. 505-2, PageID # 7286-87 and 7291.

        Vernon Ramie, of Matson, testified about another
Mercury Grand Marquis that Howard Peterson had shipped from Los
Angeles to Hilo, Hawaii, which had arrived on March 15, 2006.
<u>See</u> Testimony of Vernon Ramie at 3-59 and 3-63, ECF No. 504-3,
PageID #s 7021 and 7025.  That vehicle had license plate number
5KIW323.  <u>Id.</u> at 3-60, PageID # 7022.  The person to whom the
vehicle was being shipped was Jose Galindo.  <u>Id.</u> at 3-65, PageID
# 7027.  Matson's records showed that Matson was to call (706)
923-7721 when the vehicle was ready to be picked up.  <u>Id.</u> at 3-
60, PageID # 7022.  Special Agent Sze testified that, when he
examined the cellular telephone with the number (808) 345-9261,
found on Perez when Perez was arrested, the phone reflected 17
calls between that phone and (706) 423-7721 from March 8 to March
26, 2006.  The latter number was just one digit off the number
that had been given to Matson to contact, with a "4" rather than

a "9." Testimony of Clement Sze at 5-43, Aug. 10, 2010, ECF No.
505-2, PageID # 7310.

Sze testified that, based on Matson's records, he
identified another phone number as belonging to Galindo, (760)
396-2647. Sze determined that, on March 17, 2006, there was one
call from (808) 345-9261, one of the phones recovered from Perez,
to (760) 396-2647.

DEA Special Agent Jesse Fourmy testified that he
located a Mercury Grand Marquis that had been shipped to Hilo at
Powers Storage, in Hilo. Testimony of Jesse Fourmy at 3-106,
Aug. 5, 2010, ECF No. 504-3, PageID # 7068. That car had the
same license plate number as the car shipped by Matson, 5KIW323,
id. at 3-111, PageID # 7073, and was missing its driveshaft. Id.
at 3-112, PageID # 7074. Malia Farias, the manager at Power
Storage in Hilo, rented a storage unit to Jose Perez, copying his
California identification and getting his phone number, 345-9261,
in the process. See Testimony of Malia Farias at 4-56 to 4-58,
Aug. 6, 2010, ECF No. 505-1, PageID #s 7201-03. Farias
remembered that a blue Grand Marquis was towed into the storage
unit, indicating to her that it was not running. Id. at 4-60,
PageID # 7205.

A receipt for a 14-Karat two-tone chain from Zales in
Hilo, dated March 31, 2006, listed Jose D. Perez as the customer.
See Testimony of Norma Barroga at 3-94, Aug. 5, 2010, ECF No.

11

504-3, PageID # 7056-57.  There was a separate sales receipt for a 14-karat two-tone crucifix.  Id. at 3-96, PageID # 7058.  At the time Perez was arrested, he was wearing a gold chain and crucifix.  See Sze Test. at 4-86 to 4-87, ECF No. 505-1, PageID #s 7233-34.

At trial, a stipulation was read to the jury stating that John Gouveia, Jr., "lived and was present in Hilo, Hawaii, throughout the month of March 2006" and "lived and was present in Honolulu, Hawaii, throughout the month of July 2006."  See Trial Transcript at 5-97 to 5-98, Aug. 10, 2010, ECF No. 505-2, PageID #s 7364-65.

### B.  Procedural History.

Jose Perez, John Gouveia, Jr., and Matthew Perez were charged in a Second Superseding Indictment of October 18, 2006, with drug crimes arising out of the two shipments of Mercury Grand Marquis cars discussed above.  See Second Superseding Indictment, Cr. No. 06-00420 DAE, ECF No. 58.  Perez entered into a plea agreement, see Memorandum of Plea Agreement, Cr. No. 06-00420 DAE, ECF No. 68, in which he admitted the following:

> a.   Sometime in February, 2006, an automobile containing approximately fourteen (14) pounds of methamphetamine which was secreted in the engine driveshaft of the automobile was shipped from California to Hawaii.
>
> b.   Sometime in February, 2006, defendant JOSE PEREZ and another person traveled from California to Hawaii.

c.   On or about March 15, 2006, defendant
JOSE PEREZ and another person took possession
of the automobile which contained the
fourteen (14) pounds of methamphetamine.

d.   Shortly thereafter, defendant JOSE PEREZ
and another person removed the engine drive
shaft [sic] from the automobile and retrieved
fourteen (14) pounds of methamphetamine from
the automobile.

e.   Defendant JOSE PEREZ and another person
then delivered the fourteen (14) pounds of
methamphetamine to co-defendant JOHN GOUVEIA,
JR.

f.   Sometime in July of 2006, an automobile
containing approximately fourteen pounds of
crystal methamphetamine was shipped from
California to Hawaii via Matson Navigation
Company, Inc.

g.   On July 26, 2006, defendant and co-
defendant MATTHEW HERNANDEZ flew from
California to Hawaii.

h.   On July 27, 2006, defendant and co-
defendant MATTHEW HERNANDEZ took possession
of the automobile which had contained the
fourteen pounds of crystal methamphetamine
from Matson Navigation Company, Inc.

i.   On July 27, 2006, defendant and co-
defendant JOHN GOUVEIA, JR., attempted to
extract the fourteen pounds of crystal
methamphetamine from the driveshaft of the
automobile.

j.   A laboratory analysis established that
6.210 kilograms of 50% pure d-
methamphetamine, its salts, isomers and salts
of its isomers were hidden in the driveshaft
of the automobile which arrived in July of
2006.

See Memorandum of Plea Agreement, Cr. No. 06-00420 DAE, ECF No. 68, PageID #s 141-42.

In the plea agreement, Perez agreed to cooperate with the Government and to testify at trial against his co-Defendants. See id. at PageID #s 148-49. There is no dispute that Perez refused to so testify, causing the Government to dismiss the Second Superseding Indictment on November 6, 2006, with respect to Gouveia and Matthew Hernandez. See Order for Dismissal, Cr. No. 06-00420 DAE, ECF No. 85.

On December 30, 2008, Gouveia was indicted in the present case, along with Ramiro Hernandez. See Indictment, ECF No. 17. After a five-day jury trial and six-days of jury deliberation, the jury convicted Gouveia of each count alleged in the Indictment. The jury was hung with respect to Ramiro Hernandez. See Verdict, ECF No. 174. Ramiro Hernandez was retried. Jose Perez was called as a Government witness during the retrial, but refused to testify notwithstanding a court order to do so. Ramiro Hernandez was convicted of each count on February 2, 2012. See Verdict, ECF No. 397.

On February 9, 2011, Gouveia appealed his conviction and sentence. See ECF No. 232. The Ninth Circuit affirmed in a Memorandum Decision filed on February 23, 2012. See ECF No. 484-1. The Mandate issued on March 16, 2012. See ECF No. 415. Gouveia filed a petition for certiorari, which was denied by the

Supreme Court on October 1, 2012.  See 133 S. Ct. 188 (Oct. 1, 2012).  Although Gouveia wanted his counsel to seek reconsideration of the Ninth Circuit order based on a factual inaccuracy pertaining to what had been told to Perez before he phoned Ramiro Hernandez, Gouveia's counsel mistakenly failed to seek reconsideration.  Counsel petitioned the court for a recall of the mandate and for leave to file a belated motion for rehearing.  See Petition to Recall Mandate and to File Petition for Panel Rehearing Late, No. 11-10064, ECF No. 472-3.  The Ninth Circuit denied that petition on April 6, 2012.

On March 16, 2012, this court issued an Order to Show Cause Why Jose Perez Should Not be Held in Criminal Contempt for his failure to testify at the retrial of Ramiro Hernandez.  See Crim. No. 12-00250 SOM, ECF No. 2.  Perez pled guilty in that case to criminal contempt.  See Crim. No. 12-00250 SOM, ECF No. 29.  He was sentenced to 120 days in prison.  See Judgment, Crim. No. 12-00250 SOM, ECF No. 38.

As part of the present motion for relief under § 2255, Gouveia says that, in March 2013, he contacted Jose Perez at the Federal Detention Center in Honolulu.  Gouveia says that Perez indicated a willingness to testify that, at the time Perez placed the monitored calls to Ramiro Hernandez, Perez did not know that Government agents were recording them.  Perez allegedly said that he would not have agreed to make those calls had he known they

15

would be recorded.  Gouveia says that Perez is also willing to testify that Gouveia is innocent of the charges and played no role in the importing and distributing of the methamphetamine at issue in this case.  See Declaration of John Gouveia, Jr., ECF No. 472-5, PageID #s 5953-54.

In a declaration dated July 11, 2014, Jose Perez states, contrary to Gouveia's contention, that Perez "will not be a witness for either side . . . nor . . . sign a declaration for either side."  He says, "I do not wish to have any further involvement in this case."  Declaration of Jose Perez, ECF No. 516-1, PageID # 7419.  This position is consistent with Perez's refusals to testify in the earlier case against Gouveia and Matthew Hernandez and in the retrial of Ramiro Hernandez, even in the face of being held in contempt.  Neither Perez nor Gouveia is presently in the District of Hawaii, and this court determines that it would be futile to convene an evidentiary hearing in Gouveia's § 2255 case in which Perez will assert the same kind of refusal to testify.

**III.    ANALYSIS.**

A federal prisoner may move to vacate, set aside, or correct his or her sentence if it "was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is

16

otherwise subject to collateral attack . . . ."  28 U.S.C.
§ 2255.  There are restrictions on what claims can and cannot be
raised in a § 2255 petition.

For example, a § 2255 petition cannot be based on a
claim that has already been disposed of by the underlying
criminal judgment and ensuing appeal.  As the Ninth Circuit
stated in Olney v. United States, 433 F.2d 161, 162 (9th Cir.
1970), "Having raised this point unsuccessfully on direct appeal,
appellant cannot now seek to relitigate it as part of a petition
under § 2255."

When a § 2255 petitioner has not raised an alleged
error at trial or on direct appeal, the petitioner is
procedurally barred from raising the issue in a § 2255 petition
if it could have been raised earlier, unless the petitioner can
demonstrate both "cause" for the delay and "prejudice" resulting
from the alleged error.  As the Court said in United States v.
Frady, 456 U.S. 152, 167-68 (1982), "[T]o obtain collateral
relief based on trial errors to which no contemporaneous
objection was made, a convicted defendant must show both
(1) 'cause' excusing his double procedural default, and
(2) 'actual prejudice' resulting from the errors of which he
complains."  Id.; accord Davis v. United States, 411 U.S. 233,

17

242 (1973).  To show "actual prejudice," a § 2255 petitioner

"must shoulder the burden of showing, not merely that the errors

at his trial created a possibility of prejudice, but that they

worked to his actual and substantial disadvantage, infecting his

entire trial with error of constitutional dimensions."  <u>Frady</u>,

456 U.S. at 170.

> **A.    Appellate Counsel Was Not Ineffective in Failing
> to Timely Seek Reconsideration of the Ninth
> Circuit Order.**

The Ninth Circuit affirmed Gouveia's conviction and

sentence in a memorandum decision of February 23, 2012.  <u>See</u> ECF

No. 484-1.  In that decision, the Ninth Circuit stated:

> The agent's testimony about the instructions
> he gave Perez did not violate Gouveia's right
> to confrontation because these statements did
> not indicate to the jury that Perez had made
> incriminating statements about Gouveia.
> <u>Unlike the agent's testimony in the case of</u>
> <u>United States v. Gomez, 617 F.3d 88, 91-92</u>
> <u>(2d Cir. 2010), there was no indication that</u>
> <u>Perez was asked to call or discuss his co-</u>
> <u>conspirators, buyers, or suppliers</u>.
> Furthermore, there were other reasonable
> explanations for the agent's interest in
> extracting information about Gouveia from
> Hernandez.  In addition, unlike <i>Gomez</i>, the
> agent's instructions were necessary for the
> jury to understand the meaning of code words
> used by Perez and Hernandez during the
> recorded calls.

ECF No. 484-1, PageID #s 6063-64 (emphasis added).  But the

record indicates that Jones had told Perez to call Ramiro

Hernandez and "advise him that he had given the drugs to Gouveia."  Jones Test. at 2-78, PageID #6853.

Gouveia did not timely seek reconsideration, and instead sought to have the mandate that issued recalled so that such a motion could be filed.  See ECF No. 472-3.  That petition was denied.  Gouveia's first argument in his § 2255 motion is that his appellate counsel was ineffective in failing to timely seek reconsideration of the Ninth Circuit order.  While counsel admits that he missed a deadline, this court is unpersuaded that this amounted to ineffective assistance warranting relief under § 2255.

To establish ineffective assistance of counsel, Gouveia must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  There is "a strong presumption" that counsel's conduct was reasonable and that counsel's representation did not fall below "an objective standard of reasonableness" under "prevailing professional norms."  Id. at 688.  Even if a petitioner can overcome the presumption of effectiveness, the petitioner must still demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Id. at 694. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction," judicial scrutiny of counsel's performance is highly deferential. Id. at 689.

Even assuming that Gouveia's appellate counsel's representation fell below an objective standard of reasonableness, Gouveia fails to establish prejudice. Gouveia says, "Had counsel filed a timely petition . . . , the Court would have rendered a different result." ECF No. 472, PageID # 5921. However, the record gives no indication that the Ninth Circuit would have reversed Gouveia's conviction, reduced his sentence, or otherwise mitigated Gouveia's circumstances if the rehearing motion had been timely filed. To the contrary, the paragraph of the Ninth Circuit order that Gouveia complains about contains numerous reasons as to why Gouveia's confrontation rights were not violated. Accordingly, it is highly unlikely that the Ninth Circuit would have found that his confrontation rights were violated had it correctly noted that Special Agent Jones had told Perez to call Ramiro Hernandez and to tell Ramiro Hernandez that the drugs had been given to Gouveia.

Although Jones instructed Perez to tell Ramiro Hernandez that the drugs had been given to Gouveia, Perez told

Ramiro Hernandez that the drugs had been given to "him."  Because Gouveia's name was not part of the taped recordings, it cannot be said that Gouveia's confrontation rights were violated, especially in light of the other reasons the Ninth Circuit rejected the confrontation right claims.

Moreover, the taped recordings provided little going to the issue of whether Gouveia was guilty or not guilty.  Even without the recordings, there was overwhelming evidence of Gouveia's involvement with the methamphetamine shipments.  In July 2006, the Government found methamphetamine in the draftshaft of a Mercury Grand Marquis that had been shipped to Honolulu from California.  The Government removed the drugs and the driveshaft and installed a different driveshaft.  The Government then returned the car to Matson and waited for it to be picked up.

The car was ultimately picked up, and agents proceeded to watch the car.  Eventually, they saw Perez and Gouveia arrive in a Dodge Durango that drove up to the Mercury Grand Marquis, which was parked off of Sand Island Access Road.  Perez got out of the Durango and into the Mercury Grand Marquis.  Perez and Gouveia then separately drove the cars to the Pearlridge Shopping Center.

There, Perez parked the Mercury Grand Marquis with two of its wheels on top of the concrete bumper in the stall.  This made it easier to get under the car.  Agents saw both Perez and Gouveia under the car.  By the time agents "moved in" to confront Gouveia and Perez, Gouveia was under the car but Perez was next to it.  Gouveia came out from under the car holding a socket wrench.  Agents found three bolts from the car when agents looked under the car.  Inside the Durango, agents found a socket wrench set that was missing the socket wrench corresponding to the one Gouveia was holding.

Agents also found a receipt for a pipe cutter and a cutting wheel big enough to cut the driveshaft of the car.  The receipt had the name "John" written on it, as well as the phone number of a telephone found in the Durango that Gouveia had driven.

When asked what he was doing, Gouveia told the agents that he was helping a friend fix his car.  Gouveia claimed to have met Perez for the first time that day at the shopping center.  He also seemed surprised when asked why he had not fixed the car before driving it to Pearlridge Shopping Center.

There were numerous telephone calls between the prepaid cellular telephone found on Perez and the phone found in the

Durango driven by Gouveia.  The retail manager of AT&T Mobility testified that two of the prepaid phones found in the Durango were registered to men named "John" with different last names.

Although the recorded telephone calls between Perez and Ramiro Hernandez did not address or mention the earlier March 2006 methamphetamine shipment, agents had located in a Hilo storage unit a Mercury Grand Marquis shipped at that earlier time that had been rented by Perez.  This car, shipped by the same person who shipped the one in July 2006, was missing its driveshaft.  Gouveia stipulated that, at the time the car arrived in Hilo in March 2006, he was in Hilo and that, at the time the car arrived in Honolulu in July 2006, he was in Honolulu.

The above evidence was sufficient to support the jury's determination that Gouveia was guilty.  Because Gouveia fails to establish on the present record any possibility that the decision of the Ninth Circuit would have been different had his appellate counsel timely filed a petition to reconsider the order based on the mistaken perception that Jones had not told Perez to call Ramiro Hernandez and to tell Ramiro Hernandez that the drugs had been delivered to Gouveia, Gouveia fails to establish ineffective assistance of counsel.

**B.  Trial Counsel Was Not Ineffective in Failing to Seek Suppression of the Taped Phone Calls.**

Gouveia next argues that trial counsel was ineffective in failing to file a motion to suppress the tapes of the three phone calls from Perez to Ramiro Hernandez.  Gouveia contends that, under 18 U.S.C. § 2511(2)(c), the Government was authorized to tape the calls only if one of the parties consented to the taping.  That section states, "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

Gouveia says that Perez is willing to testify that he did not know the Government was taping the calls.  Perez, on the other hand, has submitted a declaration that indicates that he is unwilling to testify in this case.  <u>See</u> ECF No. 516-1.  Even if Gouveia did, as he claims, get a prior agreement from Perez to testify in this § 2555 proceeding, this court has nothing indicating that Perez now will testify.  Given the two criminal cases in which Perez did not testify, and Perez's acceptance of a prison term for criminal contempt as a result of the second failure, this court is not surprised.  This leaves Gouveia with no evidence before this court establishing the factual predicate

for his assertion. This court therefore determines that Gouveia's trial counsel cannot be said to have been ineffective in failing to seek suppression of the recordings on the ground that Perez did not consent to the taping. Nothing in the record suggests that trial counsel could have presented evidence supporting suppression on that ground.

Even if this court determined that Gouveia's trial counsel's representation fell below the level of objective standard of reasonableness, Gouveia has not demonstrated that he would have been prejudiced. As noted above, the overwhelming evidence at trial demonstrated his guilt, and the phone calls Gouveia says should have been suppressed had little impact on the result of the trial with respect to him.

> **C. Gouveia Has Procedurally Defaulted on His Claims that the Government Violated His Due Process Rights by Failing to Provide Exculpatory Evidence and By Allowing Agent Jones to Provide Allegedly False Testimony to the Jury.**

Gouveia's third argument is that the Government violated his Due Process rights by failing to turn over exculpatory evidence and by allowing Special Agent Jones to testify falsely. Gouveia has procedurally defaulted on these claims.

Gouveia claims that the Government failed to provide him with exculpatory evidence, including 1) the California Sheriff's Department's reports regarding a tip, 2) reports by the individuals who were present when the driveshaft was opened, 3) reports prepared by Pearlridge Shopping Center security guards, 4) reports by all agents present when Gouveia was arrested, 5) surveillance camera footage from Pearlridge Shopping Center, and 6) the identity of any person whose fingerprints were on the driveshaft, bolts, and socket wrench. Gouveia certainly could have and should have known at trial and at the time of his appeal that he did not have this information, even assuming that the Government had the enumerated items of evidence, that the items were exculpatory, and that the items were not turned over.[1] Gouveia fails to demonstrate "cause" as to why he did not raise this argument earlier. See <u>Frady</u>, 456 U.S. at 167-68. Accordingly, he has procedurally defaulted on these arguments.

Gouveia has similarly procedurally defaulted on his argument that his Due Process rights were violated when Special Agent Jones allegedly testified falsely as to 1) drilling a hole in the driveshaft and having methamphetamine fall out, and

---

[1]The record does not establish that the Government even had, among other things, fingerprints from the driveshaft, bolts, and socket wrench of anyone the Government could identify.

2) Gouveia's presence under the Mercury Grand Marquis and his holding of a socket wrench when he emerged from under the car. At the time Special Agent Jones testified, Gouveia knew whether the statements were true or not. Accordingly, he fails to show "cause" for his failure to raise the alleged constitutional violation at trial and on appeal. He has procedurally defaulted on this claim. Id.

### D. Gouveia Has Not Established that He is Actually Innocent.

In Gouveia's fourth and final argument, he claims that he is actually innocent. In support, he says that Perez is willing to testify as to his innocence. As discussed above, Perez is unwilling to testify in this matter. This unwillingness is consistent with Perez's earlier positions. Accordingly, Gouveia fails to establish the factual predicate for his claim that he is actually innocent.

### E. The Court Declines to Appoint Counsel.

In his Reply, Gouveia requests appointment of counsel to pursue this § 2255 motion. That request is denied.

Under 18 U.S.C. § 3006A(a)(2), counsel may be appointed for an impoverished habeas petitioner whenever the court determines that the "interests of justice so require." Such appointment of counsel becomes mandatory when an evidentiary

hearing is required.  <u>Bashor v. Risley</u>, 730 F.2d 1228, 1233 (9th Cir. 1984).  As discussed below, an evidentiary hearing is not required for this motion.

The court exercises its discretion in declining to appoint counsel under the circumstances presented here, as the appointment of an attorney would not make a difference in the result.  Even if appointed, habeas counsel could not demonstrate prejudice for purposes of his ineffective assistance of appellate counsel claim.  Gouveia fails to offer evidence to support his claims relating to actual innocence and the alleged absence of consent by Perez to the taping of calls, and no attorney could make a better case for Gouveia absent testimony by Perez in this matter.  To the extent Gouveia seeks to assert Due Process claims that he has procedurally defaulted on, no attorney could undo the default.

**F.    The Court Decides This Matter Without a Hearing.**

The court denies Gouveia's § 2255 motion without holding an evidentiary hearing, as the record before the court conclusively demonstrates that Gouveia is not entitled to § 2255 relief.  <u>See</u> 28 U.S.C. § 2255(b) (hearing required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief").

28

## G.    The Court Declines to Issue a Certificate of Appealability.

The court declines to grant Gouveia a certificate of appealability.  An appeal may not be taken to the court of appeals from a final order in a § 2255 proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(B).  The court shall issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a district court denies a § 2255 petition on the merits, a petitioner, to satisfy the requirements of § 2253(c)(2), "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  When, however,

> the district court denies a habeas petition
> on procedural grounds without reaching the
> prisoner's underlying constitutional claim, a
> [certificate of appealability] should issue
> when the prisoner shows . . . that jurists of
> reason would find it debatable whether the
> petition states a valid claim of the denial
> of a constitutional right and that jurists of
> reason would find it debatable whether the
> district court was correct in its procedural
> ruling.

Id.

No reasonable jurist would find this court's assessment of the merits of Gouveia's constitutional claims debatable or wrong. Nor would any reasonable jurist determine that the various procedural grounds for denying Gouveia's § 2255 petition are debatable.

**IV.     Gouveia is Not Entitled to DNA Testing of the Driveshaft, Bolts, and Socket Wrench.**

Under 18 U.S.C. § 3600(a), this court may order DNA testing of evidence when all of the requirements in subsections (a)(1) to (a)(10) are satisfied. That subsection states:

> Upon a written motion by an individual under a sentence of imprisonment or death pursuant to a conviction for a Federal offense (referred to in this section as the "applicant"), the court that entered the judgment of conviction shall order DNA testing of specific evidence if the court finds that all of the following apply:
>
> (1) The applicant asserts, under penalty of perjury, that the applicant is actually innocent of--
>
>     (A) the Federal offense for which the applicant is under a sentence of imprisonment or death; or
>
>     (B) another Federal or State offense, if--
>
>         (i) evidence of such offense was admitted during a Federal death sentencing hearing and exoneration of such offense would entitle the applicant to a reduced sentence or new sentencing hearing; and

(ii) in the case of a State offense--

(I) the applicant demonstrates that there is no adequate remedy under State law to permit DNA testing of the specified evidence relating to the State offense; and

(II) to the extent available, the applicant has exhausted all remedies available under State law for requesting DNA testing of specified evidence relating to the State offense.

(2) The specific evidence to be tested was secured in relation to the investigation or prosecution of the Federal or State offense referenced in the applicant's assertion under paragraph (1).

(3) The specific evidence to be tested--

(A) was not previously subjected to DNA testing and the applicant did not–

(i) knowingly and voluntarily waive the right to request DNA testing of that evidence in a court proceeding after the date of enactment of the Innocence Protection Act of 2004; or

(ii) knowingly fail to request DNA testing of that evidence in a prior motion for postconviction DNA testing; or

(B) was previously subjected to DNA testing and the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing.

(4) The specific evidence to be tested is in the possession of the Government and has been

subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced, or altered in any respect material to the proposed DNA testing.

(5) The proposed DNA testing is reasonable in scope, uses scientifically sound methods, and is consistent with accepted forensic practices.

(6) The applicant identifies a theory of defense that--

    (A) is not inconsistent with an affirmative defense presented at trial; and

    (B) would establish the actual innocence of the applicant of the Federal or State offense referenced in the applicant's assertion under paragraph (1).

(7) If the applicant was convicted following a trial, the identity of the perpetrator was at issue in the trial.

(8) The proposed DNA testing of the specific evidence may produce new material evidence that would--

    (A) support the theory of defense referenced in paragraph (6); and

    (B) raise a reasonable probability that the applicant did not commit the offense.

(9) The applicant certifies that the applicant will provide a DNA sample for purposes of comparison.

(10) The motion is made in a timely fashion, subject to the following conditions:

(A) There shall be a rebuttable presumption of timeliness if the motion is made within 60 months of enactment of the Justice For All Act of 2004 or within 36 months of conviction, whichever comes later. Such presumption may be rebutted upon a showing--

        (i) that the applicant's motion for a DNA test is based solely upon information used in a previously denied motion; or

        (ii) of clear and convincing evidence that the applicant's filing is done solely to cause delay or harass.

(B) There shall be a rebuttable presumption against timeliness for any motion not satisfying subparagraph (A) above. Such presumption may be rebutted upon the court's finding--

        (i) that the applicant was or is incompetent and such incompetence substantially contributed to the delay in the applicant's motion for a DNA test;

        (ii) the evidence to be tested is newly discovered DNA evidence;

        (iii) that the applicant's motion is not based solely upon the applicant's own assertion of innocence and, after considering all relevant facts and circumstances surrounding the motion, a denial would result in a manifest injustice; or

        (iv) upon good cause shown.

(C) For purposes of this paragraph--

        (i) the term "incompetence" has the meaning as defined in section 4241 of title 18, United States Code;

(ii) the term "manifest" means that
which is unmistakable, clear, plain, or
indisputable and requires that the opposite
conclusion be clearly evident.

Gouveia does not satisfy all ten subsections. For
example, despite his assertion to the contrary, Gouveia does not
show, under § 3600(a)(6), that the evidence would establish his
actual innocence. Nor does Gouveia show under § 3600(a)(7) that
the identity of the perpetrator was in issue at trial. Gouveia
does not claim, for example, that, when agents moved in to arrest
the men at the Pearlridge Shopping Center who were "working on
the car," he was not present.

Even if the court assumes that DNA evidence would
establish that it was Perez, not Gouveia, under the car holding
the socket wrench, that evidence would not "raise a reasonable
probability that the applicant did not commit the offense." See
18 U.S.C. § 3600(a)(8)(A). There was still evidence that Gouveia
was present when the attempt was made to remove the drugs from
the car. Agents saw both Gouveia and Perez under the car.
Gouveia told the agents that he first met Perez at the shopping
center, but he was seen with Perez earlier. Nor does he explain
why he did not attempt to fix the car before driving it to the
shopping center. The receipt for the pipe cutter and cutting

wheel that could have been used to cut the driveshaft had his first name on it and a phone number for a phone that was in the Durango Gouveia drove. There were also many phone calls between phones Perez had and the phones that were in the Durango that he was driving. Under these circumstances, it cannot be said that the requested DNA evidence would have changed the result of the trial.

Accordingly, the court denies Gouveia's request for DNA testing of the driveshaft, the bolts, and the socket wrench.

**III.      CONCLUSION.**

For the foregoing reasons, Gouveia's § 2255 Petition and his request for DNA testing are denied.

If Gouveia believes that this court has inadvertently failed to address a ground for relief raised in his Petition, he is asked to so notify the court by August 11, 2014, including in any such notification (1) a description of no more than 25 words of each such issue, (2) the title of the document in which the issue was raised, (3) the date the document was filed, and (4) the page(s) of the document on which the issue was raised. This notification shall not include anything other than the preceding information and is not intended to be a substitute for

any other motion or other filing.  No court deadline is affected by this request for notification.

In case Gouveia does file such a notification, the Clerk of Court is directed not to enter judgment at this time. However, the Clerk of Court is directed to automatically enter judgment against Gouveia if the court receives no such notification by August 25, 2014.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, July 28, 2014.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
Chief United States District Judge


United States of America v. Gouveia, Crim. No. 08-00739 SOM (02); ORDER DENYING PETITION UNDER 28 U.S.C. § 2255; ORDER DENYING REQUEST FOR DNA TESTING OF EVIDENCE